UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DANNY RUFFNER, | : | Case No. 3:11-cv-63 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS SUPPORTED
BY SUBSTANTIAL EVIDENCE, AND AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore

unentitled to disability insurance benefits ("DIB") and supplemental security income

("SSI").  (*See* Administrative Transcript ("Tr.") (Tr. 17-31) (ALJ's decision)).

**I.**

On February 10, 2003, Plaintiff filed applications for DIB and SSI.  (Tr. 17).

The ALJ issued a decision on October 11, 2005, finding that Plaintiff was not disabled

and not entitled to benefits.  (Tr. 97).  The Appeals Council denied review, making the

ALJ's decision the final decision of the Commissioner.  Plaintiff did not appeal the

denial.  (Tr. 17, 89-102, 108-110).

In March 2006, Plaintiff filed second applications for DIB and SSI, alleging a

disability onset date of October 12, 2005, the day after the ALJ's final and binding

decision. (Tr. 149-156). Plaintiff alleged disability due to "congestive heart failure,

depression, and difficulty reading and writing." These applications were also denied

initially and upon reconsideration. (Tr. 17, 111-114, 117-123, 125-134).

Another hearing was held at which Plaintiff amended his onset date to February 3,

2007, the date of his fiftieth birthday. (Tr. 17, 53). On August 17, 2009, the ALJ found

that Plaintiff was not disabled. (Tr. 17-31). The Appeals Council again denied review,

making his decision the final decision of the Commissioner. (Tr. 1-3). Plaintiff then

commenced this action in federal court for judicial review of the Commissioner's

decision pursuant to 42 U.S.C. § 405(g).

In his August 17, 2009 decision, the ALJ found that Plaintiff had severe

"adjustment disorder with mixed features; borderline intellectual functioning; history of

alcohol abuse reported in remission; coronary artery disease and congestive heart failure

history, stable; high cholesterol; sleep apnea." (Tr. 21). However, he determined,

pursuant to AR 98-4(6),[1] that there was an absence of new and material evidence that

---

[1] In relevant part, AR 98-4(6) reads: "When adjudicating a subsequent disability claim
with an unadjudicated period arising under the same title of the Act as the prior claim,
adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council
on the prior claim in determining whether the claimant is disabled with respect to the
unadjudicated period unless there is new and material evidence relating to such a finding or there
has been a change in the law, regulations or rulings affecting the finding or the method for
arriving at the finding."

      The ALJ was not free to make a new determination about Plaintiff's residual functional
capacity, whether or not he agreed with the 2005 ALJ's findings, unless he first found that new
and material evidence existed.

    The question before this Court is whether substantial evidence supports the ALJ's
determination that there was no new and material evidence justifying a departure from the
previous ALJ's findings.

    Also, because Plaintiff's insured status expired in June 2007, he must demonstrate that he
became disabled prior to June 30, 2007 to qualify for DIB. 20 CFR § 404.101.

documented a significant change in Plaintiff's condition since the previous hearing decision. Therefore, he found the previous decision binding and determined that Plaintiff was not disabled. (Tr. 21-27).

Plaintiff was born on February 3, 1957 (52 years old on the date of the ALJ's decision). (Tr. 149). He has an eighth grade education and was in special education classes in school.[2] (Tr. 178). Plaintiff is married and has one dependent child who does not live with him. (Tr. 20). His past relevant work consisted of working as a forklift operator, which was medium exertional work activity and semi-skilled. (Tr. 50).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2007 (Exhibit B3D).

2. The claimant has not engaged in substantial gainful activity since February 3, 2007, the amended alleged disability onset date (20 CFR 404.1571, *et seq.*, and 416.971, *et seq.*).

3. The claimant has the following severe impairments: adjustment disorder with mixed features; borderline intellectual functioning; history of alcohol abuse reported in remission; coronary artery disease and congestive heart failure history, stable; high cholesterol; sleep apnea (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

---

[2] Plaintiff denies being able to read or write. (Tr. 20). However, the ALJ found that while Plaintiff's capacity for reading and writing is limited, he is not illiterate. (Tr. 30).

-3-

5.   The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following additional limitations: the opportunity to alternate between sitting and standing every 15 minutes per hour; no more than simple tasks requiring no reading or writing; minimal interpersonal contacts in the workplace.

6.   The claimant is unable to perform past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on February 3, 1957. Since the amended alleged disability onset date the claimant is classified as an individual who is "closely approaching advanced age" (50-54 years old) for Social Security purposes (20 CFR 404.1563 and 416.963).

8.   The claimant has a 7th grade or "limited" education as defined for Social Security purposes (20 CFR 404.1564 and 416.964).

9.   The claimant does not have "transferable work skills" within the meaning of the Social Security Act (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been disabled, as defined in the Social Security Act, from February 3, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21-31).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB or SSI. (Tr. 31).

On appeal, Plaintiff argues that the ALJ erred in rejecting the opinion of his treating physician. The Court will address this argument in detail.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm.

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

The record reflects that:

On July 30, 2003, Plaintiff was evaluated by Dr. Bill Smith, a clinical neuropsychologist, at the request of the Bureau of Vocational Rehabilitation. (Tr. 234-239). Plaintiff gave a history of making poor grades from the third grade to the eighth grade when he left school. He inhaled gasoline fumes, glue, and paint thinner, and used marijuana as a teenager. He spent six months in jail in 2003 for marijuana trafficking. Plaintiff worked as a fork lift operator from 1976 to 1999. (Tr. 234). He was married for twenty-four years and then divorced. He had two teenage sons from the marriage who lived with their mother. Plaintiff lived with his girlfriend and her son. (Doc. 9 at 3).

Dr. Smith reviewed Plaintiff's medical records and discovered that Plaintiff had a history of anxiety and depression and had started counseling at the Miami County Mental Health Center on March 28, 2003. Plaintiff gave a medical history of three myocardial infarctions and a four vessel coronary artery bypass surgery in 1996, four stent placements in 2004, ten cardiac catheterizations, atherosclerotic heart disease, hyperlipidemia, and hypercholesteremia. (Tr. 235). Plaintiff had a blunted and flat affect, poor eye contact, and his psychomotor rate was significantly slowed. Dr. Smith found that his "overall presentation [was] consistent with an underlying depressive disorder." (Tr. 236). On the WAIS-R, he scored a Verbal IQ of 81, a Performance IQ of 83, and a Full Scale IQ of 82 (80-89 = low average). He read and spelled at less than a third grade level and performed arithmetic on a sixth grade level. (*Id.*) His information

-6-

processing rate was significantly slowed and he was functionally illiterate. (Tr. 238). Dr. Smith's diagnoses were reading disorder and major depressive disorder, recurrent, and moderately severe. His ability to deal with job training and job acquisition and maintenance was limited by his depression, health status and reading disorder. (Tr. 239).

On October 26, 2004, Dr. Roberts, Plaintiff's treating cardiologist, reported that Plaintiff "continu[ed] to suffer with marked fatigue w/weakness B/L hand w/arm numbness w/chest discomfort." (Tr. 328). Plaintiff was seen in the emergency room on January 8, 2005 for chest pain. (Tr. 240). He was discharged on January 10, 2005 and it was determined that his coronary artery disease was not the cause of his chest pain. (Tr. 240, 244). On January 18, 2005, Dr. Roberts reported that Plaintiff's chest pain was due to acute purulent bronchitis and not from a cardiac problem. (Tr. 325-326).

On January 27, 2005, Plaintiff was referred to Dr. Gebhart, as Dr. Roberts thought his chest discomfort might be GI related. (Tr. 318). Because of the results of the June 2005 catheterization, Dr. Roberts did not feel that his discomfort was cardiac in nature. (Tr. 316). Plaintiff was seen again on May 17, 2005 in the emergency room for chest pain. (Tr. 248).

On June 2, 2005, Plaintiff underwent a left cardiac catheterization which indicated coronary artery disease. (Tr. 254-260). On June 17, 2005, Plaintiff was seen in the emergency room for chest pain. (Tr. 261-267). An EKG showed no abnormality and there was no evidence of acute coronary artery syndrome. (Tr. 261, 262, 265).

-7-

Plaintiff was seen in the ER on December 27, 2005, again for complaints of chest pain. (Tr. 272-281). He was admitted overnight for observation. (Tr. 274, 276). Plaintiff's EKG revealed "normal LV with hypokinesia of the interventricular septum and mildly reduced LV ejection with no effusion." (Tr. 277). The impression was musculoskeletal chest wall pain. (Tr. 284). Plaintiff underwent a nerve block injection on January 26, 2006 for treatment of a nerve root and plexus disorder. (Tr. 287-288).

On May 15, 2006, Dr. Gebhart, Plaintiff's family physician, reported that he was seeing Plaintiff for chest pain that was not cardiac in nature. Dr. Gebhart stated that Plaintiff was diagnosed with depression of the bipolar type II with hypomanic swings, severe anxiety, coronary artery disease, shortness of breath, and costochondritis, that resulted from his depression and anxiety. Plaintiff was unable to walk more than one hundred feet, owing to his musculoskeletal chest pain. He was limited to lifting no more than five pounds for only fifteen minutes a day. Dr. Gebhart stated that Plaintiff was socially backwards, very shy, and extremely anxious. He had problems with short-term memory and concentration. (Tr. 330). Although Plaintiff's depression and anxiety had improved with medication, he still had significant problems and Dr. Gebhart opined that Plaintiff was borderline mentally retarded based on observations. (Tr. 331).

On January 16, 2006, Dr. Roberts again noted that although Plaintiff had been seen multiple times in ER for chest pain, he did not think the pain was cardiac in nature. (Tr. 311). In May 2006, Dr. Roberts again reported that Plaintiff had been seen multiple times

-8-

in the ER for chest pain, which he thought was probably musculoskeletal. On August 2, 2006, Plaintiff reported an improvement in his condition and stated that his heart beat harder when he did activities like carry out the trash but that he had not experienced anginal chest discomfort. His leg symptoms (cramping and pain) had improved on the Crestor. (Tr. 304).

Plaintiff was seen again on August 20, 2006 for chest pain. (Tr. 337-346). EKG revealed "sinus tachycardia with a ventricular rate of 126." (Tr. 338). He had a temperature and an elevated white blood count and was admitted for observation. (Tr. 342). Plaintiff had been cleaning out the apartment above his home for three days and the apartment had had a significant number of cats. He was diagnosed with possible leptospirosis, clostriduium difficile colitis, and chronic musculoskeletal chest pain. (Tr. 344, 346-347).

On August 31, 2006, Dr. Roberts saw Plaintiff during a hospitalization because his legs had become numb, he was shaking all over, and he had a fever. Since his hospitalization, he had experienced increased dyspnea (shortness of breath). He had problems climbing a flight of stairs and had complaints of chest discomfort and dizziness since his discharge. Dr. Roberts noted that despite his cardiac surgeries, "he has had recurrent bouts of lift-altering angina and weakness, which make it difficult for him to do work on any kind of consistent basis. Additionally, he has been troubled with diastolic congestive heart failure." (Tr. 298). Dr. Roberts observed, "He did not have any signs of

decompensated congestive heart failure on exam but looked weak, fatigued and worn out." (*Id.*) He was classified as functional class II-III.[3] (Tr. 299)

A September 7, 2006 EKG revealed "low-normal left ventricular systolic function" and an "[e]stimated ejection fraction of 50%." (Tr. 296). On November 30, 2006, Dr. Roberts noted that Plaintiff had chest tightness with stress but he was now able to distinguish the tightness from angina and had not been back to the ER since he last saw him. (Tr. 292, 410).

Dr. Alan Boerger, psychologist, evaluated Plaintiff on October 23, 2006, at the request of the State agency. (Tr. 349-353). Plaintiff stated that he was in regular classes in school but he felt that he had been "pushed through." Plaintiff was in and out of boys' school as a youth for drinking, smoking marijuana, and stealing. He was arrested in 2001 for selling marijuana and lost his job as a laborer when he was sent to jail. His previous work activity had been as a crane and forklift operator for twenty-four years. (Tr. 350). Dr. Boerger observed that Plaintiff had problems with recalling dates and times. (Tr. 351). Plaintiff's intellectual functioning was judged to be in the low average range and he spent most of the day sleeping or watching television. (Tr. 352). Dr. Boerger opined

---

[3] Physicians assess the stages of heart failure according to a functional classification system (Class I-IV). Class II indicates slight limitation of physical activity. Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea. Class III indicates marked limitation of physical activity. Comfortable rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea.

that Plaintiff had dysthymic disorder[4] and an anxiety disorder with a GAF of 54.[5] He was mildly limited in his ability to relate to others and moderately limited in his ability to understand and follow instructions and deal with work stress. He was moderately to markedly impaired in his ability to sustain attention and perform simple repetitive tasks. (Tr. 353).

Dr. Patricia Semmelman, a non-examining psychologist, reviewed the record on November 6, 2006, at the request of the State agency. (Tr. 356). She found that Plaintiff was mildly restricted in his daily activities and moderately restricted in his social functioning and ability to maintain concentration, persistence, or pace. (Tr. 368). She adopted the RFC finding of the previous ALJ's decision. (Tr. 356). On April 4, 2007, Dr. Catherine Flynn, another nonexamining psychologist, affirmed Dr. Semmelman's assessment. (Tr. 381).

On November 7, 2006, the record was reviewed by Dr. Gary Hinzman, a non-examining physician at the request of the State agency. He adopted that ALJ's decision of October 11, 2005 and limited Plaintiff to light work activity with the ability to alternate between sitting and standing every fifteen minutes. He did find that Plaintiff had a

---

[4]  A chronic type of depression in which a person's moods are regularly low.

[5]  The Global Assessment of Functioning ("GAF") is a numeric scale (0-100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living. A score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

significant history of cardiac disease. (Tr. 373-374). Plaintiff was limited to occasionally kneeling. (Tr. 374). Dr. Hinzman specifically found that Plaintiff's symptoms were attributable to a medically determinable impairment, that the severity and duration of the symptoms were not disproportionate to the expected severity or duration, and that the severity of the symptoms and their alleged effect on Plaintiff's ability to function was "consistent with the total medical and nonmedical evidence including the claimant's own statements." (Tr. 377). He found that Dr. Gebhart's opinion was not "fully supported by the objective evidence." (Tr. 378). On April 7, 2007, Dr. Villanueva, another non-examining physician, affirmed Dr. Hinzman's assessment. (Tr. 382).

Plaintiff was seen in the emergency department for chest pain on January 31, 2007. (Tr. 398-401). He was thought to have acute coronary artery syndrome and was transferred to Dayton Heart Hospital, where he was admitted. (Tr. 384-397, 400, 402-409). A stress test performed on February 2, 2007 demonstrated "moderate-sized area of inferolateral ischemia." (Tr. 388, 402, 406). A cardiac catheterization was performed and revealed "[m]ultivessel coronary artery disease with mild progression with a 75% ostial narrowing of the vein graft to the right coronary artery" and "[p]reserved LV function with an EF of 55% with mild anterior wall hypokinesis." (Tr. 392, 402, 406). Plaintiff was medically treated and discharged. (Tr. 394).

On August 21, 2007, Plaintiff was seen in the emergency department for chest pain. (Tr. 412-422). An EKG showed "sinus tachycardia with a ventricular rate of 110."

-12-

(Tr. 413). He was admitted to the hospital. (Tr. 414, 417, 420). There was no evidence of an acute myocardial infarction. (Tr. 417).

Plaintiff was seen in the emergency room and then hospitalized again on February 16, 2008 for chest pain. (Tr. 423-437). The discharge diagnosis was noncardiac chest pain. (Tr. 423-424). On March 14, 2008, he was again seen in the ER for complaints of chest pain. (Tr. 439-445). The diagnosis was non-cardiac chest pain. (Tr. 441).

Plaintiff was hospitalized from May 1, 2008 through May 6, 2008 for a myocardial infarction. (Tr. 446-473). A stress test indicated "inferior wall ischemia." (Tr. 446). Plaintiff underwent a selective coronary arteriography. A catheterization revealed:

1. Severe coronary artery disease with protected right coronary, protected LAD, and protected diagonal branch.

2. 40% narrowing of the distal left main.

3. Previously placed stent in 2004 in the proximal LAD widely patent.

4. Complete occlusion of the first diagonal branch, which is fed via LIMA to the diagonal with a jump to the LAD, which is extremely small caliber vessel and anastomosis.

5. Mid and distal LAD is extremely small caliber, approximately 1.5 to 1.0 mm diameter.

6. A nondominant circumflex.

7. Right coronary artery has complete occlusion in its mid portion with a saphenous vein graft to the distal RCA.

8. Left ventricle demonstrating mild hypokinesis of the posterior basal wall, overall preserved ejection fraction.

-13-

(Tr. 455-56).

On June 20, 2008, Dr. Gebhart found that Plaintiff had severe anxiety, depression, coronary artery disease, high cholesterol, and hypertension. Dr. Gebhart opined that the combination of Plaintiff's physical and mental impairments rendered him unable to perform work activity. Plaintiff had chest pains, owing to his heart problems and those pains caused him extreme anxiety. The extreme anxiety, in turn, caused him to have chest pains. These impairments caused him to be unable to work because he would miss work a number of times during the week. (Tr. 475). Dr. Gebhart opined that Plaintiff would have problems relating to others, meeting quotas or deadlines, concentrating and focusing, being reliable, behaving in an emotional stable manner, and dealing with criticism. He required high doses of Seroquil, which caused him to be tired during the day.

Dr. Gebhart related:

> In addition, the patient has diastolic congestive heart failure, which does not have to do with pump function, but with ventricle relaxation, making him run out of breath quickly and have angina quickly. Due to patient's age, coronary disease and anxiety he should not be anywhere with any type of height involved in an occupation due to falling and dizziness. He should not be around any machinery or any chemicals that would make him short of breath. He should not be around any temperature extremes, dust, noise, fumes, or humidity which would decrease the amount of oxygenation to his heart and cause him increase in angina. Also anything stressful will increase what we refer to as MVO2, which is oxygen usage by the heart. The patient should avoid anything stressful which brings on angina as mentioned above.

(Tr. 477). Dr. Gebhart found that Plaintiff could not perform even sedentary work activity and was "totally and completely disabled by his coronary artery disease, his bipolar and emotion/psychologically problems." (Id.)

On August 23, 2008, Dr. Gebhart completed interrogatories. (Tr. 500-502). He opined that Plaintiff could not perform any of the mental activities needed for work, owing to his mental impairments. (Tr. 503-508). Plaintiff had marked limitations in his daily activities and social functioning. (Tr. 508). He had marked deficiencies in concentration, persistence, or pace and had these limitations since before June 2007. (Tr. 509). Dr. Gebhart stated that Plaintiff had been diagnosed with carpal tunnel syndrome which affected his ability to lift/carry. (Tr. 510-511). Plaintiff could only occasionally lift/carry up to five pounds and frequently up to two and a half pounds. He could stand/walk for six hours and uninterrupted for one half an hour. He could sit for eight hours out of eight. (Tr. 511). He was never to climb, balance, stoop, or crouch. He could occasionally kneel and crawl. His ability to handle, finger, and feel were affected by his carpal tunnel. (Tr. 512). He was limited from height, moving machinery, chemical, temperature extremes, vibrations, noise, and humidity as a result of his anxiety, dizziness, and shortness of breath. (Tr. 513). Plaintiff could not perform even sedentary work activity. (Tr. 514).

Dr. Roberts' office notes, dated May 1, 2008 through November 30, 2008, were submitted. (Tr. 521-528). A nuclear stress test revealed resting hypotension but no

-15-

adenosine induced ischemia. (Tr. 523-525, 526). On July 3, 2008, Plaintiff had complaints of dyspnea on exertion and had been diagnosed with diabetes. (Tr. 522). On November 30, 2008, his cardiac disease was classified as Type II. He continued to have shortness of breath constantly as well as some dizziness when standing. (Tr. 521-522).

In this context of the medical and record evidence, Plaintiff alleges that the ALJ erred in rejecting the opinion of his treating physician, Dr. Gebhart, to find that Plaintiff's cardiac impairment had not progressed to the point that he was disabled as of his fiftieth birthday. (Tr. 24-25).

Plaintiff claims that the ALJ improperly considered his cardiac condition based on one sentence in the ALJ's decision, stating that Plaintiff's ejection fraction was within normal limits on a cardiac exam in 2007. (Doc. 9 at 13). From this statement, Plaintiff opines that the ALJ believed that Plaintiff had systolic[6] rather than diastolic[7] heart failure. However, there is no indication of such a finding. Moreover, a comparison of the 2005 and 2007 catherizations shows that their results were similar. (Tr. 256, 390). Although the ejection fraction was lower in the 2007 study, it was still normal. (Tr. 256). Accordingly, Plaintiff has failed to explain how his catherization results grew meaningfully worse from the prior ALJ decision.

---

[6] Insufficient contraction of the heart.

[7] Insufficient relaxation of the heart.

-16-

Next, Plaintiff argues that the opinions of the treating family physician, Dr. Gebhart, are entitled to controlling weight. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). An ALJ must give the opinion of a treating source controlling weight if he finds the opinion "well-supported by the medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). If the opinion of a treating source is not accorded controlling weight, the ALJ must consider factors such as the doctor's specialization, in determining the weight to give the opinion. *Wilson*, 378 F.3d at 544.

First, it is not even clear that Dr. Gebhart is a treating source for the purposes of Plaintiff's heart impairment. 20 C.F.R. §404.1527(d)(2)(ii).[8] The record indicates that Dr. Gebhart noted that Plaintiff's cardiac issues were being treated by Dr. Roberts. (Tr. 475, 477). Additionally, Dr. Gebhart provided two contradictory medical opinions – one that Plaintiff could not even do sedentary work (Tr. 477), and another that Plaintiff could walk for six hours per day and sit for eight hours per day (Tr. 511). Moreover, the records from Plaintiff's treating cardiologist, Dr. Roberts, indicate that the Plaintiff was

---

[8] "We will look at the treatment the source has provided and the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your opthamologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain." *Id.*

-17-

in fact doing better than he ever had.[9]

With respect to Plaintiff's mental impairments, the ALJ observed that Dr.

Gebhart's opinion was based primarily on subjective reports. (Tr. 25). Furthermore, the

review of two psychologists found Plaintiff only moderately impaired, Plaintiff never saw

a psychiatrist or received psychotherapy, and conceded that his anxiety and depression

medicines were helping. (Tr. 44). The Court acknowledges that specialization is just one

factor in evaluating the weight given to an opinion. *Lovett v. Comm'r of Soc. Sec.*,

3:10cv443, 2011 U.S. Dist. LEXIS 131113, at *20 (Nov. 14, 2011 S.D. Ohio). *See also*

20 CFR § 404.1527(d)(2)(ii) (consideration is given to the treatment the medical source

has provided and the *kinds* and *extent of examinations* and *testing* the source has

performed in determining how much weight to afford the opinion). However, the lack of

objective testing, the records of the mental health specialists and cardiologist, and Dr.

Gebhart's contradictory opinions all weigh against affording controlling weight to his

opinion.

Ultimately, while Plaintiff may disagree with the ALJ's decision, his decision is

clearly within the "zone of choices" afforded to him. *Mullen v. Bowen*, 800 F.2d 535,

---

[9] Plaintiff's cardiologist notes that in August 2006 Plaintiff had "no chest discomfort.
He is doing better than ever." (Tr. 305). In November 2006 he wrote that he was "pleased to say
[Plaintiff] is doing better than I have ever seen him." (Tr. 292). In July 2008, Dr. Roberts wrote
that Plaintiff was "probably doing better when I [saw] him today than he has been in some time."
(Tr. 522). In November 2008, the doctor wrote that Plaintiff had "been doing well for himself
without having recent chest pain or chest pressure." (*Id.*) These statements support the ALJ's
view that Plaintiff's condition was stable. (Tr. 24).

545 (6th Cir. 1986) ("The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference."). Although this is a close case, the issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Accordingly, the Court finds that the ALJ's decision is supported by substantial evidence.

## III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Danny Ruffner was not entitled to disability insurance benefits, is found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED.**

Date: 12/7/11

Timothy S. Black
United States District  Judge